WALTER JENNERY, RESPONDENT, *v.* AARON B. OLM-
STEAD AND WILLIAM H. CLEMENT, APPELLANTS.

*Agreement for compensation for services, out of " profits "—meaning of that word.*

The defendant Olmstead having been elected president of a savings bank, a reso-
lution was passed fixing his compensation, which resolution provided that he
should " receive such sum or sums from the net profits of the institution as
such profits, after paying all incidental expenses, may warrant, not exceeding
$1,000 per annum." During one of the years for which Olmstead claimed to be
entitled to compensation, United States bonds held by the bank had increased in
value, so that their market-price at the end of the year was greater than their
cost price.

*Held,* that as the bonds were not sold at the end of the year, nor their value then
determined by agreement between the parties, the increase in their market-
value was not a "profit" within the meaning of that term as used in the said
resolution. (LEARNED, P. J., dissenting.)

APPEAL by the defendants from a judgment for $952.06 damages
and $413.16 costs against them and in favor of the plaintiff, entered in
the Saratoga county clerk's office on the 6th day of October, 1883,
upon the verdict of a jury.

This action was brought upon a bond given by the defendant Olm-
stead as principal, and Clement as surety, to the Saratoga Savings
Bank, conditioned for the faithful performance by Olmstead of his
duties as president and general actuary of said bank. The Saratoga
Savings Bank was an institution doing business at Saratoga Springs,
incorporated under chapter 626 of the Laws of 1867. On the 19th
day of August, 1867, the defendant Olmstead was elected president
and general actuary of this bank, the resolution fixing his compen-
sation providing "that as compensation for his services in that
capacity he receive such sum or sums from the net profits of the
institution as such profits, after paying all incidental expenses, may
warrant, not to exceed $1,000 per annum." On the day following
Olmstead's election he qualified by giving the bond upon which
the action is brought, and entered upon his duties as such officer,
and continued to act as such until January 14, 1873, and continued
in charge of the bank until February 10, 1873. Previous to or on
the 1st day of January, 1873, Olmstead drew out of the funds of
the bank $931.85, which he charged to himself on that day as cash,

and on the 10th day of February, 1873, the further sum of $424.99, also charged to himself on that day as cash.

The action was once before tried, when the plaintiff recovered $1,038.88, with costs. This was affirmed by the General Term, but reversed by the Court of Appeals, that court holding, in opposition to the views of the Supreme Court, that although no provision was made in the contract of employment for annual rests, yet a reasonable construction of the resolution was, that if profits were earned in any one year, Olmstead was entitled to them as salary, irrespective of losses occurring in subsequent years of his administration; and that as the trial court had found that there was at one time during his service a surplus of $648.43, he was entitled, on the proof as it then stood, to deduct that amount from any sum which it might be found that he had subsequently taken. The Court of Appeals held further, that the $424.99 taken by Olmstead, February 10, 1873, could not be recovered in this action, for the reason that after January 14, 1873, Olmstead's relation to the bank was changed from that of president and general actuary, which offices he held when the bond was given, and became that of a mere custodian, and that any breach of duty in that capacity was not covered by the terms of the bond. Upon the trial it was conceded by the defendants that no profits were made by the bank in any year but 1869, and proof was offered by them to show that July 1, 1869, the bank had a surplus of $648.43.

*M. Hale* and *E. F. Bullard,* for the appellants.

*E. T. Brackett,* for the respondent.

PECKHAM, J. :

The chief question in this case is whether the bank made any profits in the year 1869, from which, under the agreement between the parties, the salary of the president could be paid. The defendants contend that there were profits to the amount of $648.43, while the plaintiff claims that there were none. The method by which the sum above mentioned is arrived at is by taking the difference between the purchase-price and the market value of certain government bonds then owned by the bank (the value of the bonds having in the meantime appreciated), and calling that appreciation in value profits. The method pursued by the plaintiff

was to take the actual cost of the bonds, add to that the accrued interest on the coupons yet unpaid, and call the total the value of the bonds. By this means a difference in the value of the bonds was made in the sum of $503, being that amount less than made by the defendants.

Both plans, it is perceived, take it as proper to obtain the value of the bonds, although unsold, as a means of deciding upon the profits. I agree to the correctness of neither plan. It is not a proper way to ascertain the fact of profits to estimate the value of bonds yet unsold and upon finding the estimated value to exceed the price paid, to call the difference profits. It is not profits in any true sense of that term. If the bonds were actually sold at such price, the transaction would then be completed and the profits actually realized instead of merely estimated.

It does not appear that defendant's counsel treats the method pursued by defendants as showing actual, realized profits, but he terms them estimated profits, and argues that the contract meant estimated profits instead of actual realized profits, for otherwise he claims that every piece of property of the bank would have to be sold annually in order to determine whether profits were made, which he very sensibly states would be absurd. The trouble with this mode of reasoning lies in the confusion of property with profits. To take an inventory of all the property of the bank and to place a valuation on it, and from it to deduct its liabilities, is perfectly proper in order to arrive at the financial standing of the bank as to solvency, and if solvent, how much beyond it the institution may be deemed to be.

Here was a savings bank without capital stock, and with but one resource at first from which to obtain money, viz., deposits, upon which it must pay interest. The means of profit to it were simply the possibility of so investing these moneys as to obtain a greater return for them than the bank was to pay by way of interest, and in a possible sale of securities or property purchased at a greater price than was paid for them or it. It could not have been contemplated by the parties to the contract that the president should have a right to demand the sale of any property at any particular time for the mere reason that a sale would then result in a profit, and thus possibly insure him a salary for that year.

The purchase and sale of stocks, as a business and for a profit, is not contemplated as pertaining to a savings bank; and in this case, by the very terms of the charter, only certain securities could be invested in, and could only be sold by the concurrence of a majority of the trustees. The investment in government bonds is  assumed to partake of the character of a permanent investment; and in order to determine the profits of the year it is not necessary either to sell the securities or to estimate their value. The profits are, as I have said, the amount of money received by the bank from its investments, by way of interest, over and above the amount of interest it has to pay its depositors, together with the amount of any money it had received by the sale of property over and above its cost to the bank. If such a sale had been made, then a profit had arisen, but if not, then no profit had accrued simply from the fact that the property, if sold, would have resulted in a profit. It is as yet an uncompleted transaction, and with not the slightest right on the part of the president to demand its completion in order that he may earn his salary. As I have said, such right could not have been contemplated by the parties to this contract; and in case of non-sale, there exists no right to estimate what the profits would have been if the property had been sold and call that a profit made in that year. Suppose the property were soon after sold at a loss, the result would show that there had been no profit, but an actual loss, yet the president had received his salary on the basis of a profit. There is no reason, therefore, that I can see why the contract should be read as if it had said that the salary of the president should be based upon the estimated profits of each year.

It is plain that the same rule does not obtain to the full extent in the case of a loss, for a loss may be sustained without a sale of the property. It may deteriorate permanently and plainly in value, or may be burned up or stolen. In brief, if anything happen by which the bank sustains plainly and permanently a depreciation in, or total obliteration of, the value of property, such depreciation or obliteration must be regarded as a loss sustained, and such loss must be deducted from the profits before a net profit can be arrived at. This is wholly distinct from adding a possible profit by the sale of property, if then sold, to the actual realized profits otherwise made, and at the same time keeping the property.

In the one case property has been permanently depreciated in value, or actually destroyed, and the amount of such depreciation or destruction is an actual realized loss, while in the other it is simply a fact that if the property were then sold a profit would be made, but as it is not, *non constat* that when sold a loss may not be met with.

It is claimed that profits are substantially realized by this appreciation in the value of government bonds, if the bonds are unsold, just as much as if they were sold. If unsold, it is said that the value of the bond is as well known by a simple reference to the reports of the stock market as it would be by an actual sale, and that if sold, all that is got in exchange is another article, whose value may also fluctuate from time to time, and hence there is no sense in demanding an actual sale of the bond before asserting a realization of a profit. Nevertheless the bond unsold is only called worth so many dollars, according to the market price thereof, whereas the bond when sold has actually brought so many dollars, and these dollars are in money, which is a standard of value, made so by law, and that money is now on hand.

It can now be determined as a fact whether a profit had been made, notwithstanding the other fact that in long periods of time the standard of value itself varies in its own intrinsic value. I therefore, in order to see what profits were made in the year 1869, reject wholly from the account the appreciation in the market price of the government bonds on the day the balance was struck. That appreciation was the sum of $648.43, and without that there was no profit.

The court erred, therefore, in leaving it to the jury to say whether there were profits in 1869 or not. The error did not harm the defendants, for the judge should have decided, as matter of law, that there were no profits, at least so far as this bond transaction was concerned.

The Court of Appeals has only held that as it appeared there were profits in 1869, the President was entitled to take his salary for that year out of them. The question now discussed has not been in any way passed upon by that court. The evidence in the case is, that when the term of service of the president expired, in looking over the books it appeared that the assets of the bank were

less than its liabilities by $931.85, and more than that sum the defendant Olmstead had drawn for himself. *Prima facie* it would appear as if the bond he gave had been violated by his drawing money under such circumstances, when to draw it left the bank insolvent. He therefore attempted to explain it. One explanation was that this deficit only appeared by striking out this estimated profit by the appreciation in government bonds, and taking the method adopted on the part of the plaintiff relative to that subject and above described. But we hold such item ought to be struck out, and the defendant shows no justification thereby in drawing from the bank the amount above stated. As to the other amounts claimed they seemed to have been submitted to the jury fairly by the judge, and I do not see that from the testimony there was any such question in regard thereto as to show any error on the part of the judge by such submission. The condition of the bond signed by the defendants was that Mr. Olmstead should " well, truly, honestly and faithfully " perform his duties as actuary, etc.

The defendants claim no breach of the bond had been proved, because at most the drafts made by defendant Olmstead were made by reason of a mistaken construction on his part of his rights under the contract, and that there was no dishonesty or fraud in the matter.

His bond held him to a faithful performance of his duties. It surely cannot be said that he faithfully performed them when he took moneys which he had no right to take, although he took them under a mistaken belief that he had such right. It is not a mistake in bookkeeping, or in figures, or any other mere mistake resulting in his doing what he did not intend to do. He intended the very act he did, viz.: the drawing of this money, although by reason of his erroneous construction of the law he thought he was entitled so to do. In so doing he did not faithfully perform his duties. He may have thought he did, and he may have intended to, but the fact remains that he did not, and his failure resulted, as I have said, from no mistake which would in law operate as an excuse.

If, upon consultation with the trustees, there had been a mutual agreement as to the value of the property, and that it need not be sold, but an amount agreed upon as profits without such sale, then the defendant might have drawn the amount provided it did not exceed $1,000. No such case is here presented. But in regard to

the Dorner lot this method seems to have obtained. This court, upon a former appeal, decided in regard to that matter, and it must be regarded as a final disposition of the question so far as we are concerned.

It may have been erroneous to call a witness on the stand and ask him what the books prove as to any disputed fact. But the only issue as to what the books showed was not regarding their contents. All agreed as to that. It was only as to how to treat the value of these bonds. And that question was fully discussed and no mistake made as to the contents of the books by either side.

Upon certain facts, substantially undisputed, the simple question was whether profits had or had not been made, and nothing in the books obscured or threw light upon that question, which was not fully known and discussed by both sides. Under these circumstances no harm was done in allowing the general question.

I think there were no errors upon the trial which resulted in any injury to defendants, and the judgment should be affirmed, with costs.

Bookes, J.:

I concur for affirmance. I do not think there is any error in the record of which the defendants can complain.

Learned, P. J. (dissenting):

The contract between the bank and Olmstead was that, in compensation for his services, he should "receive such sum or sums from the net profits of the institution as such profits, after paying all incidental expenses, may warrant, not exceeding $1,000 per annum."

When the case was before this court on a former appeal, the court thought that, in estimating these profits, the whole period of five years, during which Olmstead was in the employment of the bank, should be taken into account without making annual rests, and reducing the profits of one year by the losses of a subsequent year. It was, however, held by the Court of Appeals (90 N. Y., 363) that this was not the true construction of the contract; that the contract was to pay the sum of $1,000 "in annual payments out of the profits of the preceding year if earned;" that if profits were "earned he was entitled to be paid, and the bank could not charge

against the profits of one year the losses of a succeeding year." The decision necessarily implies two things: First. That the profits of each year can be, and should be, determined at its end. Second. That when so determined they are not to be affected (as to this contract) by subsequent losses.

Now, as this institution was a savings bank, the duty of which was to invest its money, and keep it invested in securities, it is not to be supposed that the parties to the contract contemplated a sale every year of the securities of the bank, in order to determine what the profits of the year had been. It must have been contemplated that, without any such sale, the parties could annually ascertain how much the nets profits of the year had been.

Without making such a sale, there is no way of determining the amount of profits except by a comparison of the assets with the liabilities. And it seems to be agreed upon, on both sides, that such a comparison was proper and necessary, in order to carry out the contract as interpreted by the Court of Appeals. For it must be noticed that the question is one *under the contract;* that is how, *under the contract,* is it to be ascertained whether the net profits in any given year " warrant " Olmstead's receipt of any salary ? By using the word " warrant " the parties meant that the payment of Olmstead's annual compensation should not reduce, at the time of payment, the assets below the liabilities. The only way to determine what the net profits would " warrant," at the end of any year, was to ascertain the value of the assets and to deduct therefrom the liabilities. This would show the total net profits. Deducting from that sum the net profits of the preceding year (if any remained after paying Olmstead), the residue would be the net profits of the year in question.

Olmstead was appointed August 19, 1867. We judge that nothing was shown as to the profits of the first year.

On July 1, 1869, there is a statement which shows an excess of assets over liabilities of $648.43. The Court of Appeals say that there is no evidence that any of this was lost before August 20, 1869. It does not appear how much of this was made in 1868 and how much in 1869. But it is assumed by the Court of Appeals, and by the learned justice at the circuit, that this sum is to be taken as the net profits of the year ending August 20, 1869 ; unless

errors or improper calculation should be shown, as hereafter mentioned.

Now, in regard to this statement, the important question arises as follows : Among the assets were $6,000 in United States six per cent bonds. They cost $6,540, according to the statement. They were inventoried in the statement at their market value at that time, viz., $7,170. The plaintiff claims (in order to deprive Olmstead of part of his compensation for that year), that the bonds should be estimated thus :

| | | |
|---|---|---|
| Cost of bonds | $6,420 | 28 |
| Accrued coupons, $180 gold, worth | 246 | 15 |
| Total | $6,666 | 43 |

By this estimate the value of the bonds is reduced by $503.57, and, of course, the net profits are reduced by the same sum.

The plaintiff admits that the net profits are to be ascertained by a comparison of assets with liabilities, but he insists that in making that comparison the bonds should be estimated at just what they cost. Suppose, however, that the bonds, since their purchase, had depreciated to fifty per cent of their cost, would it have been just to estimate them still at cost and to allow Mr. Olmstead compensation on that basis ? This would be to pay him a salary out of supposed net profits, when, in fact, the bank might not be able to pay its liabilities. A depreciation in market value is no more real than an increase in market value. If these bonds had fallen to fifty per cent in the market, Olmstead could not have had them estimated in the statement at the cost price.

The Court of Appeals have distinctly said that the bank, under this contract, cannot charge against the profits of one year the losses of a succeeding year. They must have anticipated the suggestion made by the plaintiff's counsel, viz., that the bonds might subsequently depreciate, so that in the end there would be in this investment no profits. And they have said that the subsequent losses shall not, under the contract, take away the right to compensation.

If the net profits are to be determined (as the plaintiff admits) by deducting liabilities from assets, why should the bonds be estimated at what they cost ? The question is, what are " the net profits of

*the institution;* " and those are determined by finding out how much more it has than it owes. Suppose Olmstead, on the 20th of August, 1869, had sold these United States bonds; he would have received for them $7,170. And the plaintiff admits that in that case the net profits of the institution would on that day have been just what Olmstead now claims them to have been. Then suppose that the next day Olmstead had bought the same amount of bonds for $7,170. The bank would then be in precisely the same condition in which it actually was without any such sale and purchase. It could not be denied that if he had done this "the net profits of the institution" would have been $648.43. Is it a sound construction of the contract to say that by such a sale and purchase he would have become entitled to compensation to which he is not entitled?

We must remember that the question is only as to a mode of determining compensation for services. Are not Olmstead's services shown to be valuable when an investment which he made has increased in value? Does not the actual condition of the bank at the end of each year furnish the basis to which the parties, had reference in their contract? What difference whether the assets of the bank are in cash on hand or in investments? The point is, how much are the assets?

As to the Dorner lot, the resolution is not very clear. The learned justice was right in holding that the parties could agree as to its value for the purpose of estimating profits, and was also right in holding that the resolution did not have the effect of such an agreement.

But it may be remarked that if an agreement between the trustees and Olmstead as to the value of property would be material in determining net profits *without any sale*, it would seem that proof of actual value would be equally effectual.

Another point which has not been argued may be suggested. In estimating net profits the plaintiff deducts the dividends paid to the depositors. The bank could declare such rate of dividend as it chose. If these dividends were to be deducted in order to determine the net profits, it would seem that under this construction the bank might make dividends which would consume all the profits and leave nothing with which to compensate Mr. Olmstead.

I think the defendant was entitled to have the bonds estimated

at market value. This would make a difference in defendant's favor of $503.57. If plaintiff stipulates to deduct that I think judgment should be affirmed; otherwise, reversed.

Judgment affirmed, with costs.